FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**2014 OCT 22 PM 1: 19
**JACKSONVILLE DIVISION**

|  |  |  |
|---|---|---|
| ROBERT W. SUMMERS, | ) | MIDDLE DISTRICT OF FLORIDA |
| | ) | JACKSONVILLE, FLORIDA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 3:14-CV-1289-J-34PDB |
| ABBOTT LABORATORIES, INC.; | ) | |
| AABVIE, INC., AUXILLIUM | ) | |
| PHARMACEUTICALS, INC.; PFIZER, INC.; | ) | |
| PADDOCK LABORATORIES INC.; | ) | |
| WATSON- ACTAVIS PHARMACEUTICALS, and | ) | |
| JOHN DOE DRUG COMPANY 1-5, | ) | |
| Defendants. | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Robert W. Summers, ("Plaintiff"), by and through undersigned counsel, by way of complaint against Abbott Laboratories, Inc., AbbVie, Inc., Auxilium Pharmaceuticals, Inc., Paddock Laboratories Inc., Watson-Actavis Pharmaceuticals and Pfizer Inc. allege the following upon personal knowledge, information and belief:

### INTRODUCTION

1.  This case involves the prescription drugs manufactured, sold, marketed, distributed and promoted by Abbott Laboratories, Inc. and AbbVie, Inc. (AndroGel), Auxilium Pharmaceuticals, Inc. (Testim), Pfizer, Inc. (Depo Testosterone), Paddock Laboratories Inc. (Cypionate Testosterone – generic) and Watson- Actavis Pharmaceuticals (Cypionate Testosterone – generic) (hereinafter individually referenced as "Abbott," "AbbVie," "Auxilium," "Pfizer," "Paddock," "Watson- Actavis" and collectively as "Defendants") as testosterone replacement therapy. This action arises out of the Defendants' unlawful,

negligent, improper, unfair, and deceptive practices related to the manufacturing, design, sale, testing, warning, research and marketing of their testosterone products.

2.      Defendants misrepresented that AndroGel, Testim, Depo Testosterone and Cypionate Testosterone are a safe and effective treatment for hypogonadism or "low testosterone," when in fact these drugs cause serious medical problems, including life threatening cardiac events, myocardial infarction, strokes, thrombolytic events and death.

3.      Defendants engaged in aggressive, often award-winning, direct-to-consumer and physician marketing and advertising campaigns for their drugs.

4.      Consumers of Defendants' drugs were misled as to the drugs' safety and efficacy, and as a result have suffered injuries, including life threatening cardiac events, myocardial infarction, strokes, and thrombolytic events.

5.      The factual allegations and Causes of Action stated herein are plead separately, severally, jointly and/or collectively against each Defendant named in this Complaint.

**PARTIES**

6.      Plaintiff Robert W. Summers is a resident of the State of Florida.

7.      Defendant Abbot Laboratories, Inc. is a corporation organized and existing under the laws of the state of Illinois and maintains its principal place of business at 100 Abbot Park Road, Abbott Park, Illinois 60064.

8.      Defendant AbbVie is a corporation organized and existing under the laws of Delaware with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064.

9.      Defendant Auxilium Pharmaceuticals, Inc. is a Delaware Corporation having its principal place of business at 640 Lee Road, Chesterbrook, Pennsylvania 19087. Defendant is

engaged in the business of manufacturing, distributing, marketing, and/or selling prescription drugs.

10. Defendant Pfizer, Inc. is a New York corporation with its principal place of business located at 235 East 42nd Street, New York, NY 10017.

11. Defendant Paddock Laboratories Inc. is a Deleware corporation with its principal place of business located at 3940 Quebec Avenue N, Minneapolis, MN 55427.

12. Defendant Watson-Actavis Pharmaceuticals is a Nevada corporation with its principal place of business located at 400 Interpace Parkway, Parsippany NJ 07054.

13. At all times relevant herein, the Defendants were engaged in the business of, or were successors in interest to businesses that are engaged in one or more of the following, researching, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the prescription drugs at issue for the use and application by male consumers in general and the Plaintiff specifically.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332. The amount in controversy exceeds $75,000.00, exclusive of interest and costs, and complete diversity exists between the parties.

15. This Court has supplemental jurisdiction over any alleged common law or state claims pursuant to 28 U.S.C. §1367.

16. Venue in this Court is proper pursuant to 28 U.S.C. §1391 in that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District, and Defendant are subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

17. This action is brought by Robert W. Summers who was prescribed and supplied with, received and who has taken and applied the prescription drugs AndroGel, Testim, Depo-Testosterone and Cypionate Testosterone as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants. This action seeks, among other relief, general and special damages and equitable relief in order to enable Plaintiff to treat and monitor the dangerous, severe and life-threatening side effects caused or substantially contributed to by Defendants' drugs.

18. Defendants' wrongful acts, omissions, and fraudulent misrepresentations caused or were substantial contributing factors in Plaintiff' injuries and damages.

19. At all times herein mentioned, the Defendants were engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the prescription drugs, including AndroGel, Testim, Depo-Testosterone and Cypionate Testosterone, for the use and application by the Plaintiff.

20. At all times herein mentioned, Defendants were authorized to and did conduct business within the state of residence of Plaintiff.

21. At all times herein mentioned, the Defendants participated in, authorized, and directed the production and promotion of the aforementioned product when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous

propensities of said product and thereby actively participated in the tortious conduct which resulted in or substantially contributed to the injuries suffered by Plaintiff herein.

22.     Plaintiff file this lawsuit within the applicable limitations period of first suspecting that said drugs caused the appreciable harm sustained by Plaintiff. Plaintiff could not, by the exercise of reasonable diligence, have discovered the cause of Plaintiff's injuries at an earlier time because the injuries were caused without perceptible trauma or harm, and when the Plaintiff's injuries were discovered the cause was unknown to Plaintiff. Plaintiff did not suspect, nor have reason to suspect, that Plaintiff had been injured, the cause of the injuries, or the tortious nature of the conduct causing the injuries, until less than the applicable limitations period prior to the filing of this action. Additionally, Plaintiff were prevented from discovering this information sooner because the Defendants herein misrepresented and continues to misrepresent to the public and to the medical profession that their drugs, including AndroGel, Testim, and Depo-Testosterone are safe and free from serious side effects, and Defendants have fraudulently concealed facts and information that could have led Plaintiff to discover a potential cause of action.

## FACTUAL ALLEGATIONS

### Defendants AbbVie and Abbott

23.     Defendants AbbVie and Abbott are engaged in the business of manufacturing, design, distributing, marketing, and/or selling prescription drugs, including AndroGel.

24.     The Food and Drug Administration approved AndroGel 1% on February 28, 2000 for the treatment of adult males who have low or no testosterone. AndroGel 1.62% was approved in April, 2011.

25.     AndroGel is a hydroalcoholic gel containing testosterone in either 1% or 1.62%, applied

to the chest, arms or stomach and enters the body through transdermal absorption. The AndroGel 1.62% product also contains isopropyl myristate as an ointment and ethanol for absorption enhancement.

## Defendant Auxilium

26. Defendant Auxilium is engaged in the business of manufacturing, design, distributing, marketing, and/or selling prescription drugs, including Testim.

27. The Food and Drug Administration ("FDA") approved Testim on October 31, 2002, for the treatment of adult males who have low or no testosterone.

28. Testim is a hydroalcoholic topical gel containing testosterone that is applied to the shoulders and upper arms and enters the body through transdermal absorption.

## Defendant Pfizer

29. Defendant Pfizer is engaged in the business of manufacturing, design, distributing, marketing, and/or selling prescription drugs, including Depo Testosterone.

30. The FDA approved Depo Testosterone.

31. Depo-Testosterone an injectable.

## Defendant Paddock

32. Defendant Paddock is engaged in the business of manufacturing, design, distributing, marketing, and/or selling prescription drugs, including Cypionate Testosterone.

33. The FDA approved Cypionate Testosterone.

34. Cypionate Testosterone an injectable.

## Defendant Watson- Actavis

35. Defendant Watson - Actavis is engaged in the business of manufacturing, design, distributing, marketing, and/or selling prescription drugs, including Cypionate

Testosterone.

36.     The FDA approved Cypionate Testosterone.

37.     Cypionate Testosterone injectable is an injectible.

### Hypogonadism and the Development of Testosterone Therapy

38.     Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

39.     The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

40.     In men, testosterone levels normally begin a gradual decline after the age of thirty.

41.     The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood (ng/dL). Testosterone levels, however, can fluctuate greatly depending on many factors, including sleep, time of day, and medication. Resultantly, many men who fall into the hypogonadal range one day will likely have normal testosterone levels the next.

42.     Hypogonadism is a specific condition of the sex glands, which in men may involve the diminished production or nonproduction of testosterone. Hypogonadism can be the result of a medical condition, a result of taking certain medication, a consequence of injury, or can occur through the natural aging process. Hypogonadism can also begin during fetal development, before puberty, or during adulthood.

43.     There are two basic types of hypogonadism, primary and secondary. Primary hypogonadism is the result of a problem in the testicles while secondary hypogonadism is the result of an issue in the hypothalamus or pituitary glands. Either type may be the result of an inherited trait or something that occurs later in life, such as injury or an

infection. The drugs at issue are all developed for and approved by the FDA for treatment of primary hypogonadism and hypogonadotropic hypogonadism (a form of secondary hypogonadism).

44. Some common causes of primary hypogonadism are Klinefelter syndrome (a genetic, congenital abnormality of the sex chromosomes), undescended testicles, mumps orchitis, hemochromatosis, injury to the testicles, and cancer treatment. Kallmann syndrome (abnormal development of the hypothalamus), pituitary disorders, certain inflammatory diseases, and HIV/AIDS can cause secondary hypogonadism, among other things. Other relevant potential causes of hypogonadism are obesity, use of certain medication, and normal aging. Mayo Clinic, *Diseases and Conditions, Male hypogonadism, available at:* http:// www.mayoclinic.org/diseases-conditions/male-hypogonadism/basics/definition/con-20014235.

45. The slow, but steady, decrease of testosterone levels is a normal part of the aging process. In fact, studies indicate that a reduction of approximately 1% a year after the age of 30 is normal. This decrease is not hypogonadism and, according to the Mayo Clinic, "treating normal aging with testosterone therapy is not currently advisable."

46. 46. It is estimated that four to five million American men suffer from hypogonadism and about 5% of those men are currently on testosterone replacement therapy. http://www.centerwatch.com/drug-information/fda-approved-drugs/drug/23/androderm-testosterone-transdermal-system. According to an August 12, 2013 article on MDNew, 20-30 percent of men over sixty and 30-40 percent of men over eighty are estimated to be affected by hypogonadism. http:// www.mdnews.com/news/2013 08/men-and-testosterone.aspx.

47.   In 2011, the United States Census Bureau released a study entitled The Older Population: 2010. In that study, the Bureau noted that in 2000, there were 14,409, 625 males over the age of 65. That number increased to 17,362,960 in 2010 - an increase of just fewer than three million men. This increase is dwarfed by the ballooning numbers the Defendant claim are now affected by low testosterone and needing treatment.

48.   Applying the estimates of those affected by hypogonadism to the numbers provided by the Census Bureau, as of 2010, there are an estimated 3.4 - 5.2 million men over sixty that could suffer from hypogonadism. Those numbers are reflected in the Patient Education Institute's publication regarding Low Testosterone, which states that roughly five million men have low testosterone.

49.   However, a study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001-2011" indicates that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.

### The Defendants' Marketing and Advertising

50.   Testosterone therapy was once a small niche for people suffering from hormonal deficiencies caused by medical problems like endocrine tumors or the disruptive effects of chemotherapy. The drugs are now being sold as lifestyle products to counter the naturally occurring dip in male sex hormones as men age. Sales in the United States have quadrupled since 2000.

51.   After FDA approval, Defendants, respectively, engaged in advertising campaigns

9

designed to convince men that they suffered from low testosterone. Defendants conducted national disease awareness media campaigns purported to educate male consumers about the signs of low testosterone. The marketing campaigns included online media and promotional literature placed in healthcare providers' offices as well as distribution to potential testosterone users.

52. Defendants' marketing strategy is to aggressively market and sell their products by misleading potential users about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of its products.

53. Defendants undertook various "disease awareness" marketing campaign. This campaign sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low-T."

54. In an October 13, 2011 press release, Auxilium announced that the organization Medical Marketing & Media Awards awarded Auxilium's Campaign, Low T Facts, as the Best Interactive Initiative for Consumers. The release further states that "the MM&M Awards recognize exceptional creativity and marketing effectiveness in healthcare. The Low T Facts campaign was also recently noted as one of the top consumer advertisements of the year by Pharmaceutical Executive's Ad Stars, received a silver award in the Best Digital Media Campaign category from the DTC Perspectives National Ad Awards, and was a finalist in the Online Advertising Creativity category of the 2011 OMMA Awards." The Auxilium press release is available at http:// ir.auxilium.com/phoenix.zhtml?c=142125&p=irol-

newsArchiveArticle&ID=1616723&highligh

55.    In January 2013, the Medical Marketing & Media Awards recognized the AndroGel marketing team as the All-Star Large Pharma Marketing Team of the Year for its campaign "Is It Low T?"

56.    Defendants marketed the drug Depo-Testosterone, in part, using the campaign slogan "Pump Up Your T." 50. Defendants claimed that "the introduction of DEPO-TESTOSTERONE Gel in the U.S. comes at a time when only about 1.3 million (9 percent) of the estimated 14 million men with Low T are actually receiving treatment.

57.    Dr. Joel Finkelstein, an associate professor at Harvard Medical School who is studying male hormone changes with aging stated, "The market for testosterone gels evolved because there is an appetite among men and because there is advertising." Rosenthal, Elisabeth, *A Push to Sell Testosterone Gels Troubles Doctors, October 15, 2013, available at:* http:// www.nytimes.com/2013/10/16/us/a-push-to-sell-testosterone-gels-troubles-doctors.html? r=0. Dr. Finkelstein, while discussing "Low T," said, "There is no such disease."

58.    Dr. Eric Topol, a cardiologist and chief academic officer at Scripps Health in San Diego, described the testosterone levels in patients using the drugs at issue as "ridiculously high." Dr. Topol also noted, "When I ask patients why they're on it, the instant response, is, 'I have low T.' I ask, 'Why would you even get tested for that?' There isn't really a normal."

59.    Dr. Sergei Romashkan, who oversees clinical trials for the National Institute on Aging, said, "The problem is that we don't have any evidence that prescribing testosterone to older men with relatively low testosterone levels does any good." Perrone, Matthew,

*Testosterone gets marketing push, but long term unknown,* USA TODAY, September 10, 2012, available at: http:// usatoday30.usatoday.com/money/business/story/2012/09/10/testosterone-gets-marketing-push-but-lon -term-unknown/57715666/1.

60.     Not only is there disagreement about what a normal level of testosterone is once levels naturally drop due to aging, but the "symptoms" of "Low T" that the testosterone replacement therapy manufacturers urge necessitate utilizing the drugs at issue are sometimes present in men with levels above what the manufacturers of so-called "Low T" drugs define as "low" (testosterone below 300 ng/dL). A 2010 study by researchers at the University of Manchester and other European Institutions found that 25% of men with testosterone levels above that threshold had the same sexual problems for which the "Low T" drug manufacturers claim necessitates testosterone therapy.

61.     A study published in January 2014 in the Endocrine Society's *Journal of Clinical Endocrinology & Metabolism* found that many patients who are seeking and prescribed testosterone therapy appear to have normal testosterone levels and do not meet the clinical guidelines for treatment. One author of the study, J. Bradley Layton, PhD, of the University of North Carolina at Chapel Hill commented, "While direct-to-consumer advertising and the availability of convenient topical gels may be driving more men to seek treatment, our study suggests that many of those who start taking testosterone may not have a clear medical indication to do so."

62.     Yet, Defendants respectively engaged in massive advertising campaigns designed to convince men that they suffered from low testosterone. The Defendants orchestrated national disease awareness media campaigns that purported to educate male consumers

about the signs of low testosterone. The marketing campaigns consisted of television, print, internet and other media advertisements, promotional literature placed in healthcare providers' offices and distributed to potential testosterone-containing drug users, and online media including unbranded information on the internet.

63.     According to a recent New York Times article, Low T is "in large part an invented condition." Rosenthal, Elisabeth, *supra*. That fact has not even slowed the Defendant.

64.     Combined, the "Low T" drug manufacturers convinced estimated millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on their promises of safety, prevalence, and necessity. Although prescription testosterone replacement therapy had been available for years, millions of men who had never been prescribed testosterone, because their doctors had not even considered doing so, flocked to their doctors and pharmacies asking for this cure-all drug.

65.     None of the Defendants acknowledged or even hinted that consumers' low testosterone levels, assuming they were even tested, could be the result of some other issue treatable by something other than prescription medication. For example, other relevant causes of hypogonadism are obesity, use of certain medication, and normal aging.

66.     Instead, Defendants successfully created a robust and previously nonexistent market for their drugs. What began as a drug intended for a relatively small portion of the population, those with diagnosed hypogonadism, has turned into a billion dollar cash cow that thrives by targeting the egos of American men.

67.     Defendants grossly inflated claims all the while downplaying or denying the risks of testosterone replacement therapy that accompany testosterone therapy, including but not limited to heart attack and stroke, causing millions of American men to flock to their

doctor's offices and request a prescription medication that the Defendants knew or should have known was unnecessary and dangerous.

68.     Defendants marketing programs successfully sought to create the image and belief by consumers and physicians that low testosterone affected a large number of men in the United States and that testosterone replacement therapy is safe for human use, even though Defendants knew these statements to be false, and even though Defendants had no reasonable grounds to believe them to be true.

69.     Defendants advertisements suggest that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone replacement therapy with their doctors if they experienced any of the symptoms Defendants assigned to low testosterone. These alleged symptoms include listlessness, increased body fat, and moodiness. All of these symptoms are associated with conditions such as aging, weight gain and lifestyle and are not solely related to testosterone levels.

70.     Defendants' advertising programs sought to create the image and belief by consumers and their physicians that the use of their "Low T" drugs were a safe method of alleviating their symptoms, had few side effects and would not interfere with their daily lives, even though Defendants knew or should have known these to be false, and even though the Defendants had no reasonable grounds to believe them to be true.

71.     Defendants sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low-T."

72.     Defendants purposefully downplayed, understated and outright ignored the health hazards

and risks associated with using Testosterone Replacement Therapies. Defendants deceived potential Testosterone Replacement Therapy users by relaying positive information through the press, including testimonials from retired professional athletes and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

**Testosterone Replacement Therapies Are Not Safe.**

73. Testosterone replacement therapies, including AndroGel, Testim, Depo Testosterone and Cypionate Testosterone, are not safe. They are a product that causes life-threatening problems, including strokes and heart attacks. There have been a number of studies suggesting that testosterone in men increases the risk of heart attack and stroke.

74. In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued early after an exceedingly high number of men in the testosterone test group suffered adverse events.

75. In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels." The study indicated that testosterone therapy raised the risk of death, heart attack, and stroke by about 30%.

76. On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" that indicated testosterone use doubled the risk of heart attacks in men over sixty-five years of age and men younger than sixty-five with a previous diagnosis of heart disease.

77. On January 31, 2014, the FDA announced it was investigating the risk of stroke, heart attack, and death in men taking FDA-approved testosterone products and monitoring this

risk and reassessing the safety issues raised in the JAMA and PLOS ONE studies set forth above.

78.     Defendants purposefully downplayed, understated, and outright ignored the health hazards and risks associated with using testosterone therapy.

79.     Defendants deceived consumers by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

80.     Defendants concealed material, relevant information from consumers and minimized user and prescriber concern regarding the safety of testosterone therapy.

81.     In particular, in the warnings Defendants give in its commercials, online, and in print advertisements, as well as in the prescribing information, Defendants fails to mention or warn of any potential cardiac or stroke side effects and falsely represent that the Defendants adequately tested the drugs at issue for all likely side effects.

82.     Defendants concealed material relevant information from potential Testosterone Replacement Therapy users and minimized user and prescriber concern regarding the safety of Testosterone Replacement Therapy.

83.     In particular, in the warnings Defendants give in their commercials, online and print advertisements, Defendants fail to mention any potential cardiac or stroke side effects and falsely represents that Defendants adequately tested their respective drugs (including AndroGel, Testim, Depo Testosterone and Cypionate Testosterone) for all likely side effects.

84.     As a result of Defendants' advertising and marketing, and representations about its

product, men in the United States, including the Plaintiff herein, sought out prescriptions for AndroGel, Testim, Depo Testosterone and Cypionate Testosterone. If Plaintiff had known the risks and dangers associated with AndroGel, Testim, Depo Testosterone and Cypionate Testosterone, he would not have taken them and consequently would not have been subject to their serious side effects.

## SPECIFIC FACTUAL ALLEGATIONS

85. Beginning in or about 2007, Plaintiff, Robert W. Summers, was prescribed and used multiple testosterone replacement therapy drugs.

86. Robert W. Summers, at separate periods of time, was prescribed and used in their intended mr the drugs AndroGel, Testim, Depo Testosterone and Cypionate Testosterone for symptoms he attributed to low testosterone after viewing Defendants' advertisements and used those drugs as directed.

87. On or around October 13, 2013, Robert W. Summers suffered a cardiac arrest, cardiac and pulmonary embolism, blood clots and stroke caused or substantially contributed to by his use of the drugs AndroGel, Testim, Depo Testosterone and Cypionate Testosterone.

88. As a result of using AndroGel, Testim, Depo Testosterone and Cypionate Testosterone, Plaintiff was hospitalized after suffering a cardiac arrest, cardiac and pulmonary embolism, blood clots and stroke. Plaintiff spent a significant amount of time in the intensive care unit where he was told he was not likely to survive.

89. As a result of using AndroGel, Testim, Depo Testosterone and Cypionate Testosterone, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, and has suffered financial or economic loss, including, but not limited to, obligations for past, present, and future medical services and expenses.

90.    Plaintiff's use of AndroGel, Testim, Depo Testosterone and Cypionate Testosterone
       caused him to suffer serious personal and emotional injuries.

## SPECIFIC CAUSES OF ACTION FIRST CAUSE OF ACTION - STRICT
## LIABILITY/FAILURE TO WARN

91.    Plaintiff incorporates by reference herein each of the allegations heretofore set forth in
       this Complaint as though fully set forth herein.

92.    Defendants had a duty to warn Plaintiff and his healthcare providers of the risk of heart
       attack, stroke, deep vein thrombosis, pulmonary embolism and/or other death associated
       with AndroGel, Testim, and Depo Testosterone and Cypionate Testosterone.

93.    The AndroGel, Testim, Depo Testosterone and Cypionate Testosterone drug
       manufactured and/or supplied by Defendants was defective due to inadequate warnings
       or instructions because Defendants knew or should have known that the product created
       significant risks of serious bodily harm to consumers, and it failed to adequately warn
       consumers and/or their health care providers of such risks. The AndroGel, Testim, Depo
       Testosterone and Cypionate Testosterone products manufactured and/or supplied by
       Defendants was defective due to inadequate post-marketing warnings or instructions
       because, after Defendants knew or should have known of the risk of serious bodily harm
       from the use of AndroGel, Testim, Depo Testosterone and Cypionate Testosterone,
       Defendants failed to provide an adequate warning to consumers and/or their health care
       providers of the product, knowing the product could cause serious injury.

94.    Defendants had a duty to update warnings based on information received from product
       surveillance after AndroGel, Testim, Depo Testosterone and Cypionate Testosterone
       were first approved by the FDA and marketed, sold, placed into the stream of commerce,

and used in the United States and elsewhere.

95. When it left Defendants' control, AndroGel, Testim, Depo Testosterone and Cypionate Testosterone were defective and unreasonably dangerous for failing to warn of the risk heart attack, stroke, deep vein thrombosis, pulmonary embolism and/or death.

96. Plaintiff used AndroGel, Testim, Depo Testosterone and Cypionate Testosterone in a mr normally intended and reasonably foreseeable by Defendants.

97. As a direct and proximate result of Plaintiff's reasonably anticipated use of AndroGel, Testim, Depo Testosterone and Cypionate Testosterone as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## SECOND CAUSE OF ACTION - DESIGN DEFECT

98. Plaintiff incorporates by reference each paragraph of this Complaint as if fully set forth herein and alleges further as follows.

99. AndroGel, Testim, Depo Testosterone and Cypionate Testosterone were not merchantable and/or reasonably suited to the use intended, and its condition when sold was the direct, proximate, and/or contributing cause of the injuries sustained by Plaintiff.

100. Defendants placed AndroGel, Testim, Depo Testosterone and Cypionate Testosterone into the stream of commerce with wanton and reckless disregard for public safety.

101. AndroGel, Testim, Depo Testosterone and Cypionate Testosterone was defective in design in that, when it left Defendants' control, the foreseeable risks of the product exceeded the benefits associated with its design, and it was more dangerous than an ordinary consumer or ordinary healthcare provider would expect.

102.  The foreseeable risks associated with AndroGel, Testim, Depo Testosterone and Cypionate Testosterone's design include the fact that its design is more dangerous than a reasonably prudent consumer or healthcare provider would expect when used in an intended or reasonably foreseeable mr.

103.  AndroGel, Testim, Depo Testosterone and Cypionate Testosterone was in an unsafe, defective, and inherently dangerous condition, which was unreasonably dangerous to its users and in particular, Plaintiff.

104.  Defendants knew or should have known that AndroGel, Testim, Depo Testosterone and Cypionate Testosterone were defective and unsafe, even when used as instructed.

105.  Defendants did not warn Plaintiff that AndroGel, Testim, Depo Testosterone and Cypionate Testosterone, as designed, could result in adverse health or medical conditions, including heart attack, stroke, pulmonary embolism, deep vein thrombosis and/or death.

106.  Defendants, throughout the events described herein, had the economic and technical means to provide a safer alternative design that would have prevented the health and medical conditions described herein and prevented the injuries and damages suffered by Plaintiff.

107.  As a direct and proximate result of Plaintiff's reasonably anticipated use of AndroGel, Testim, Depo Testosterone and Cypionate Testosterone as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

### THIRD CAUSE OF ACTION - NEGLIGENCE

108.  Plaintiff incorporates by reference herein each of the allegations set forth in this

Complaint as though set forth herein.

109.    At all times herein mentioned, Defendants had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, prescribe and adequately warn of the risks and dangers of AndroGel, Testim, Depo Testosterone and Cypionate Testosterone.

110.    At all times herein mentioned, Defendants negligently and carelessly manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use and sold AndroGel, Testim, Depo Testosterone and Cypionate Testosterone and failed to adequately test and warn of the risks and dangers of AndroGel, Testim, Depo Testosterone and Cypionate Testosterone.

111.    Despite the fact that Defendants knew or should have known that AndroGel, Testim, Depo Testosterone and Cypionate Testosterone caused unreasonable, dangerous side effects, Defendants continued to market AndroGel, Testim, Depo Testosterone and Cypionate Testosterone to consumers including Plaintiff, when there were safer alternative methods of treating loss of energy, libido erectile dysfunction, depression, loss of muscle mass and other conditions AndroGel, Testim, Depo Testosterone and Cypionate Testosterone's advertising claims are caused by low testosterone.

112.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

113.    Defendants' negligence was a proximate cause of the Plaintiff injuries, harm and

economic loss which Plaintiff suffered, and will continue to suffer, as described and prayed for herein.

## FOURTH CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY

114.    Plaintiff incorporates by reference here each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

115.    Prior to the time that the aforementioned products were used by the Plaintiff, Defendants impliedly warranted to Plaintiff and Plaintiff agents and physicians that AndroGel, Testim, Depo Testosterone and Cypionate Testosterone was of merchantable quality and safe and fit for the use for which it was intended.

116.    Plaintiff was and is unskilled in the research, design and manufacture of the products and reasonably relied entirely on the skill, judgment and implied warranty of the Defendants in using AndroGel, Testim, Depo Testosterone and Cypionate Testosterone.

117.    AndroGel, Testim, Depo Testosterone and Cypionate Testosterone was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that AndroGel, Testim, Depo Testosterone and Cypionate Testosterone has dangerous propensities when used as intended and will cause severe injuries to users.

118.    As a result of the abovementioned breach of implied warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## FIFTH CAUSE OF ACTION - BREACH OF EXPRESS WARRANTY

119.    Plaintiff incorporates by reference here each of the allegations set forth in this Complaint as though fully set forth here.

120.    At all times mentioned, Defendants expressly represented and warranted to Plaintiff and Plaintiff's agents and physicians, by and through statements made by Defendants or their

authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that AndroGel, Testim, Depo Testosterone and Cypionate Testosterone is safe, effective, fit and proper for its intended use. Plaintiff purchased AndroGel, Testim, Depo Testosterone and Cypionate Testosterone relying upon these warranties.

121.  In utilizing AndroGel, Testim, Depo Testosterone and Cypionate Testosterone, Plaintiff relied on the skill, judgment, representations, and foregoing express warranties of Defendants. These warranties and representations were false in that AndroGel, Testim, Depo Testosterone and Cypionate Testosterone is unsafe and unfit for its intended uses.

122.  As a result of the abovementioned breach of express warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

### SIXTH CAUSE OF ACTION - FRAUD

123.  Plaintiff incorporates by reference here each of the allegations set forth in this Complaint as though set forth fully herein.

124.  Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed AndroGel, Testim, Depo Testosterone and Cypionate Testosterone, and up to the present, willfully deceived Plaintiff by concealing from them, Plaintiff's physicians and the general public, the true facts concerning AndroGel, Testim, Depo Testosterone and Cypionate Testosterone, which the Defendants had a duty to disclose.

125.  At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of AndroGel, Testim, Depo Testosterone and Cypionate Testosterone and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the

benefits, health risks and consequences of using AndroGel, Testim, Depo Testosterone and Cypionate Testosterone. Defendants knew of the foregoing, that AndroGel, Testim, Depo Testosterone and Cypionate Testosterone is not safe, fit and effective for human consumption, that using AndroGel, Testim, Depo Testosterone and Cypionate Testosterone is hazardous to health, and that AndroGel, Testim, Depo Testosterone and Cypionate Testosterone has a serious propensity to cause serious injuries to its users, including but not limited to the injuries Plaintiff suffered.

126.    Defendants concealed and suppressed the true facts concerning AndroGel, Testim, Depo Testosterone and Cypionate Testosterone with the intent to defraud Plaintiff, in that Defendants knew that Plaintiff physicians would not prescribe AndroGel, Testim, Depo Testosterone and Cypionate Testosterone, and Plaintiff would not have used AndroGel, Testim, Depo Testosterone and Cypionate Testosterone, if they were aware of the true facts concerning its dangers.

127.    As a result of Defendants' fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

### SEVENTH CAUSE OF ACTION - NEGLIGENT MISREPRESENTATION

128.    Plaintiff incorporates by reference herein each of the allegations set forth in this Complaint as though fully set forth herein.

129.    From the time AndroGel, Testim, Depo Testosterone and Cypionate Testosterone was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, Plaintiff's physicians and the general public, including but not limited to the misrepresentation that AndroGel, Testim, Depo Testosterone and Cypionate Testosterone

was safe, fit and effective for human consumption. At all times mentioned, Defendants conducted a sales and marketing campaign to promote the sale of AndroGel, Testim, Depo Testosterone and Cypionate Testosterone and willfully deceive Plaintiff, Plaintiff physicians and the general public as to the health risks and consequences of the use of the abovementioned product.

130. The Defendants made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject product.

131. The representations by the Defendants were in fact false, in that AndroGel, Testim, Depo Testosterone and Cypionate Testosterone are not safe, fit and effective for human consumption, using AndroGel, Testim, Depo Testosterone and Cypionate Testosterone is hazardous to health, and AndroGel, Testim, Depo Testosterone and Cypionate Testosterone has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff.

132. The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase and use of AndroGel, Testim, Depo Testosterone and Cypionate Testosterone.

133. In reliance of the misrepresentations by the Defendants, and each of them, Plaintiff was induced to purchase and use AndroGel, Testim, Depo Testosterone and Cypionate Testosterone. If Plaintiff had known of the true facts and the facts concealed by the

Defendants, Plaintiff would not have used AndroGel, Testim, Depo Testosterone and Cypionate Testosterone. The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

134. As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## PUNITIVE DAMAGES ALLEGATIONS

135. Plaintiff incorporates by reference here each of the allegations set forth in this Complaint as though fully set forth herein.

136. The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the rights of Plaintiff and other AndroGel, Testim, Depo Testosterone and Cypionate Testosterone users and for the primary purpose of increasing Defendants' profits from the sale and distribution of AndroGel, Testim, Depo Testosterone and Cypionate Testosterone. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

137. Prior to the manufacturing, sale, and distribution of AndroGel, Testim, Depo Testosterone and Cypionate Testosterone, Defendants knew that said medication was in a defective condition as previously described herein and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of

harm to the public, including Plaintiff and as such, Defendants unreasonably subjected consumers of said drugs to risk of injury or death from using AndroGel, Testim, Depo Testosterone and Cypionate Testosterone.

138. Despite its knowledge, Defendants, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in AndroGel, Testim, Depo Testosterone and Cypionate Testosterone and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects inherent in AndroGel, Testim, Depo Testosterone and Cypionate Testosterone. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of AndroGel, Testim, Depo Testosterone and Cypionate Testosterone knowing these actions would expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

139. Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages.

### PRAYER

WHEREFORE, Plaintiff pray for judgment against the Defendants as follows, as appropriate to each cause of action alleged and as appropriate to the particular standing of Plaintiff:

A.    General damages in an amount that will conform to proof at time of trial;

B.    Special damages in an amount within the jurisdiction of this Court and according to proof

at the time of trial;

C.     Loss of earnings and impaired earning capacity according to proof at the time of trial;

D.     Medical expenses, past and future, according to proof at the time of trial;

E.     For past and future mental and emotional distress, according to proof;

F.     Damages for loss of care, comfort, society, and companionship in an amount within the jurisdiction of this Court and according to proof;

G.     For punitive or exemplary damages according to proof on any and all causes of action for which the law allows such recovery;

H.     Restitution, disgorgement of profits, and other equitable relief;

I.     Injunctive relief;

J.     Attorney's fees;

K.     For costs of suit incurred herein;

L.     For pre-judgment interest as provided by law; and

M.     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues.

Dated this 22nd day of October, 2014.

RESPECTFULLY SUBMITTED,

Edward S. Cook, Esq.
COOK, P.C.
Georgia Bar No. 183741
(*Pro Hac Vice* Forthcoming)
Robert Underwood, Esq., *Of Counsel*
Florida Bar No. 684971
3350 Peachtree Rd., NE
Suite 1100
Atlanta, GA 30326
Phone: 404.841.8485
Fax: 404.841.8045
Email:  ecook@cookpclaw.com
    runderwood@cookpclaw.com

**ATTORNEYS FOR THE PLAINTIFF**